The next case is number 153042 McMillan v. DOJ Good morning. Happy New Year, Your Honor. Adam Carter. Mr. Carter, when you're ready. On behalf of Colonel McMillan, may it please the Court, by failing to properly allocate the burden of proof in this case, the MSPB wound up putting the burden all on my client, Colonel McMillan. That failure infected every factual finding by the administrative judge. Well, you don't dispute that there was some requirement for you to show motivation. So you had to show that it was motivated by the military duties. That's correct. And isn't it at least a contention on the saying that you hadn't met that part of the burden? They were saying that, but by not properly analyzing and allocating the burden, Judge Newman's opinion in Sheehan is clear. There is the initial burden. We don't have the plaintiff, the petitioner in this case, doesn't have a heavy burden to show motivating factor. Then the burden shifts to the employer, the agency here, to determine and to prove. That's the key. They have to prove that they would have taken this decision to deny him his tour extension. Where is the proof that, for example, everybody who sends a testy email to their military duty are being treated the same as the non-military? Indeed, the proof was on our side. We showed that Mr. Walsh, who by everyone's admission, failed to follow chain of command. He was the one that walked down to Patrick Stemkamp's office and got the permission to use this device, this report. He was the one who was the intelligence officer. My client didn't even know what the FSR was or its import. They're already on the way down to Mr. Stemkamp's office. In trying to determine what were your exercise of your military duties and what were the exercise of the civilian duties, certainly there was an obligation to engage in military activity and there was an assignment to analyze the DEA's removal from Bolivia. But there was no obligation to use the DEA report for that purpose, was there? Quite so. My client has a colleague who's in the office who was in Bolivia when they got kicked out. He goes down the hall using open door policy and goes down and says, Hey Mike, is there anything that you'd recommend? I've got this military assignment. Is there anything you'd recommend I read up on? He says, Oh yeah, there's the FSR. Let's go down to Pat and get approval for you to use it. So he goes down the hall and takes them almost by the hand and then gets approval from the third level supervisor. There's no discussion of this chain of command or anything like that. And indeed, this is Walsh's report. This is Walsh's, Bailey Wick, he's an intelligence officer. He knows what is compartmentalized and so forth. And so he's the one who needs to follow chain of command. He doesn't get disciplined. He gets his tour renewed and he's non-military. All of this spirals out of control when my client goes out on military service and has an email exchange with his boss trying to sort of defend himself. Now I think we can all agree that the mode of communication of email is not ideal. And it doesn't allow for tone. It doesn't allow for a lot of things. But remember, my client is serving in the military while stationed in Lima, Peru. He's a weekend warrior. But he can't go up to Miami every weekend to go do his military service. He has to do it in large chunks as he did here. So he's off on military duty and sure enough, he got the permission from the third level supervisor and he goes off to do his military service. The army is so impressed with his work, they want it to be more. And then what's critical here is that now Mr. Stenkamp, who by the way, factually, he and Walsh were formerly in Bolivia, those guys now realize that this military assignment is becoming more and they want to shut it down. They have a change of heart and they bring up this idea of, well, you haven't followed your chain of command. Well, my client comes back. He is appropriately apologetic. He follows orders. There's no suggestion he didn't follow orders. And then he's all of a sudden disciplined. Let's clarify this chain of command. Okay, then... What if we agree with you that your initial burden was met, that there wasn't an appropriate shift to the government to prove, and we can debate what the standard is, but assume it's a congruent, that in fact they would have taken this action, but for, that they would have taken it anyway. What would we have to do? To remand for purposes of a reanalysis under the appropriate Sheehan burden shifting? I don't think so because here you have nothing. You have, there are two pieces of evidence in the record that you already have. You have the interrogatory answer that says Colonel Sheehan broke no rule or regulation at all. And you also have, and this is key, you have the, I believe it's called the DEA 460, Form 460. This is the, this is the form that sets out a DEA agent's performance for the prior period. That form says that he significantly exceeds expectations. And there is no way for the government to now come in and say, oh, well, you didn't, as they did in the hearing, oh, well, you didn't hit certain metrics. You didn't have confidential informants. None of that is at all in the official form of his performance. And so if the government is to prove something, they've got to, they've got to tilt the scales. But there's nothing on their side. Where's the evidence of we treat, we have people applying for tours all over the country, all over the world, in fact. Where's the evidence that says when somebody is not outstanding, they're not rated outstanding, well, then we don't extend their tour. Where's the evidence that says that we had five people transferring into Lima who were Spanish speakers and we needed to get rid of a couple of Spanish speakers. There's no evidence of any of that. And they simply don't have it. So with, to answer your... What about the evidence of the emails? Can't they say that the tone is inappropriate? I understand it's not the military, but it is still a law enforcement organization. I understand that. But what I think is that that decision that, first of all, we have a line drawing problem. What is an inappropriate email enough to satisfy the government's burden here? But in addition, I think the other problem that we have is there isn't anything more. There isn't anything more. And that is clearly his military service. He's in Florida with the army when he sends the email. And when MSPB seizes on the fact that he wrote, his point is that our reservists are in two capacities all the time. They're working for their civilian employer and they're working for the military. And here, it's most definitely about the stuff of the test email is about his military service, his military assignment, the fact that he'd gotten permission to use this resource, now being told not to. And if I may, just to defend my client's reaction, you know, the military, they teach military officers to question decisions once. You question it once. You ask the superior officer, is this what you want to do? Yes? This is... I would recommend not. But do you call the superior officer's decision illogical? Well, I think that might have been a poor choice of words. If my client had to do it over again, I think he would agree. But the point is he was making his point one time, then he was shut down, and he followed orders. There's no suggestion that he didn't. And again, we have the... If I could just continue with the factual narrative, what then happened... Can I ask you, I guess, what feels like it's somewhere near the heart of what the board was thinking? Is it right to interpret USARA so that we're here dealing with forms of personnel decision that are not, you know, adverse actions under the 75-12 regime. So in the ordinary course, an agency doesn't have to worry too much about how those decisions are being made, putting aside prohibited personnel actions and whistleblower and stuff like that. And what seems to be the concern here is that when an employee who's also a reservist is performing work while on reserve, that there's suddenly a kind of license to engage in, let's just call it misbehavior, use inappropriate language, go outside the chain of command, that suddenly now his actual employing agency has to walk on eggshells about questioning. How do you deal with that worry that I think is overhanging this case? Well, I think that when the burden, analytically, when the burden shifts to the agency to prove that it would have taken the decision anyway, the adverse decision, that that's where the administrative judge and then the board can weigh that and decide whether or not there's been a proof that, so for instance... But suddenly now the agency has to keep records of how it deals with other employees who do similar things outside the 75-12 regime. That's a burden and presumably a significant disincentive to making an otherwise okay decision to, you know, okay, you're not coming, you're not staying in Lima, which you wouldn't be able to challenge otherwise. Because the proof difficulty is just too darn hard. You know, I don't think that this is any different than what every other employer constantly does with its employees. When employees engage in protected activity, they go on leave under the Family Medical Leave Act. When they go on, when they engage in protected activity on behalf of protected classes or on behalf of themselves. This is the kind of record keeping that employers would do anyway. And so, if your Honor's concern is that employers of military folks would be on eggshells for, you know, bombs being lobbed at them while the person is away on military service, I think that there is an element that all wraps up in the agency being able to meet its burden of proof. Remember, this is a burden that they bear. By design, remember, USERA was enacted in order to make this harder to discipline and terminate service members on account of their service. So once the burden has shifted analytically, then this is where the employer would have to prove. Isn't the difficulty in this case that in the normal case, there's a clear line of demarcation between what you're doing for your military duty and what you're doing for your civilian service. Here, by virtue of the military assignment, it gets merged to some extent. True. So normally you wouldn't have a DEA agent analyzing DEA activity as part of their military assignment. I agree. So how do we deal with the fact that there is this merging of the two? I think of an example like, I try to think of hypotheticals, but, you know, a uniformed service member who's in the logistics business and works for FedEx and then goes off to their job at the Army or the Air Force, let us say, and they say, hey, how do you guys do it at FedEx that you pack all the planes with all that stuff? And he says, oh, well, we do this, this, and this at FedEx. And, you know, the reason why we have a reservist military is we want them to bring to the military the best practices and all the stuff that they get in their civilian employment and bring it into the military context. Here, he's a military intelligence officer, and they had to come up with an assignment for him to do. And they gave him this assignment. He can't refuse his military orders. He can't. So he has to comply with his military orders, and this is what he did. I notice I'm not sure if this is my rebuttal time or my... We'll save you some rebuttal time. I appreciate that. But I'll come back to that question. Okay. Let's hear from Ms. Ely. May it please the Court. The MSPB correctly applied this Court's burden-shifting framework established in the Sheehan case, and substantial evidence supports the Board's determination that Mr. McMillan failed to meet his burden of proving by preponderance of the evidence that his military service was a motivating factor in the denial of his tour extension. Can I just ask? At least two of the grounds that are asserted to be the grounds for the denial of tour have to do with the way in which he carried out his military obligation. How does that not conclusively resolve in his favor the first step? Actually, what Mr. McMillan must prove is that military service was a motivating factor. Here, at most, it's incidental. Mr. McMillan offered no proof that, for example, he would have been treated better had he been working on a personal project, authoring a book on DEA policy, or had he been authoring a paper for an institution of higher learning because he was taking a night school class. The court recognized that it's virtually impossible to establish the motivation since personal motivations are rarely expressed, but the court set out things that you could do to circumstantially establish the motivation. Three of the four factors that Sheehan spelled out are present here. One, the proximity in time. Two, the inconsistencies between the proper reasons and the other actions of the employer. Those were very clearly established. And the fourth, the disparate treatment of certain employees compared to other employees. He established all of those things. Why isn't that enough? Because, Your Honor, Sheehan made clear, and I know that there's a dispute between the parties as to whether this is dicta. Sheehan explicitly stated that in determining whether the employee has proven that his protected status was part of the motivation for the agency's conduct, all record evidence may be considered. And tellingly, too, in Sheehan, the court made clear that it understood that the board had not segregated. It says, although the MSPB did not separate the discrimination determination into two discrete parts, the first for which the claimant bears the burden of proof and the second for where the employer bears the burden of proof, its decision as a whole followed the strictures of the framework developed by the NLRB in the court. That means that Sheehan did not establish that if you tick off three or four factors, because it's certainly a flexible inquiry, then automatically the complainant has met its burden of proof. Instead, all record evidence has to be considered. And that is consistent with the notion of preponderance. Let's look at some of the record evidence then. I mean, you've got an argument. One of the arguments is it didn't follow his chain of command. Stenkamp didn't even know what the chain of command was. He thought Walsh was in his direct chain of command. So how can the chain of command have been so important when the head guy doesn't even know who's in his own chain of command? Well, I think it's important for... Your Honor, I'm not familiar with the record site that you appear to have in mind with Stenkamp saying he did not know his own chain of command. Mr. Stenkamp certainly testified... He said he thought Walsh was in his direct chain of command. He thought Walsh reported directly to him. Right, and Walsh actually did have an intermediary. One of the things that Mr. Stenkamp did also testify to was the fact that he assumed by virtue of the fact that Mr. McMillan was coming to him with this request for information that it had been fully vetted. He said he didn't even remember McMillan coming to him. He only remembered Walsh coming to him. He said he didn't even remember McMillan being in the room. That is... I think that is inconsistent with my memory of the record. And there was testimony from everyone, including Walsh, that up until that point in time there had been an open-door policy in a very small office. Well, that's absolutely true. However, there was consistent testimony from Mr. Walsh and others, including Ms. Jimenez, who didn't have a dog in the fight, that indeed when you were trying to use, it was something from Ms. Jimenez, who stated on Joint Appendix 740-41, that you wouldn't choose to disseminate or attempt to disseminate information outside of the agency before you ran it through your chain of command. And that's certainly the distinction that was at work here. And it's also borne out by the contemporaneous correspondence. Well, there's no written correspondence about the chain of command ordering him to follow chain of command until after all these events occurred. That's not true, Your Honor. Specifically, the email that... At the time that this is going on, on page 920, one of the things that Mr. Walsh advises Mr. McMillan of, as of July 21st, 2010, he states to Mr. McMillan, you really need to contact WAN before finalizing it. I think the latest consensus among upper management is the report should not be attributable to DEA at all. And WAN is a reference to Juan Arriviega, who is, and I may be mispronouncing it, who is Mr. McMillan's immediate supervisor. In addition, when the issue of the... of Mr. McMillan's participation in the telecom, where he says, I'm going to be representing DEA, this is in the record at page 961, Mr. Stenkamp's immediate reaction on hearing about this is to state, Pete, no, no, no. First, did you run this through your chain? The answer is no, you did not. But again, when he was seeking approval, no one asked him if he ran it through his chain. Walsh knew that he had come directly to him. Walsh didn't say, you got to run it through your chain. Walsh didn't run it through his chain, and Walsh never got punished for either of those acts. Right. The chain of command only becomes important once they get nervous about the fact that they've authorized him to use it. Your Honour, respectfully, I believe that's incorrect. Mr. Walsh actually explained that there's a difference between someone coming to him for internal DEA work and external work, and that given Mr... given that McMillan's work was for external purposes, not for military purposes, just that it was for external purposes, they were required to fully vet it through the chain of command. But Walsh didn't ask him about that, and Walsh didn't vet it through his chain of command. But the onus is not really on Walsh. The real question here is the question of release of the information outside of the DEA. That onus falls... Which had already been authorized. And there have been edits back and forth. STEMCAMP had even been involved in the edits. I mean, when you've got the head of the office editing your report and knowing what you're using the information for, I mean, how is it that you're supposed to think you've got to go to somebody else? Well, Your Honour, the board found it actually... On the point of it being already authorized, one of the premises on which that authorization was based was a misapprehension by Mr. STEMCAMP that authorizations had already been given. And the board actually made a specific finding that the management... that the board credited Mr. STEMCAMP's testimony that he believed... that he assumed that... He explained that he assumed that the... Oh, right. The record site is Joint Appendix 229 and Joint Appendix 233. Mr. STEMCAMP stated that he didn't initially question whether Mr. McMillan went through his chain of command because he assumed that he had. Because since the academy, individuals in these kinds of positions had been instructed that chain of command presents safety issues, issues with consistency of message, and the like. So the board actually indicated that he found... Mr. STEMCAMP... The board found STEMCAMP's explanation, which is, of course, based also on a credibility determination, which is virtually unreviewable, according to Kahn. The board stated, I found STEMCAMP... of why he did not immediately question whether McMillan had gone through his chain of command reasonable and credible. STEMCAMP now retired, testified confidently, as did Walsh, Stefik, Araviaga, and Jimenez. Their testimony was consistent and credible. This is one of the credibility findings that went to the board's decision as to its finding that Mr. McMillan was required to follow the chain of command and, in fact, had not. So under Sheehan, which indicates that all record evidence has to be considered, this is evidence supporting the board's finding that Mr. McMillan had not met his burden of proof, certainly, because there is some implicit weighing that has to go on. In Sheehan, the board makes clear that there is some weighing that inherently goes on. If we disagree with you on whether or not his initial showing was sufficient to shift the burden, would we have to remand for the board to assess whether or not the government met its burden, or would we be able to determine based on this record alone? Your Honor, the court would be able to determine based on this record alone, because, contrary to what I believe Mr. McMillan's counsel suggested, there is an abundance of evidence that they would have taken this action irrespective of military. That's not the standard. The question is whether the board, looking at the evidence, did actually find that the government established that it would have taken the same action. There could be enough evidence for it to find that, enough evidence for it not to find that, but the question initially of what it found would be... Your Honor, you're correct. The board did not find that. And our... I don't think you've contended that that is the only possible finding on the record. That is, that the board would commit error, be reversed by us, if it found that the government did not establish that it would have taken the same action. It would be hard to conceive of a scenario in which the board could back away from credibility determinations associated with Araviaga, Stefik, and Stenkamp, all testifying consistently that the decision... But the credibility determination was, oddly, was premised only on, they seemed to be telling the truth. There's lots of factors. When you instruct a jury as to how you make credibility determination, one of them has to be, is it supported by other evidence of record or contradicted by other evidence of record? Are there inconsistencies with respect to how they make a whole series of analyses to make a credibility determination? This was simply a credibility determination that seemed almost too cute. In other words, I call this credibility because I looked at them and they seemed to be saying nice things. Your Honor, that is not... Your Honor, the government would disagree with that, specifically because of some of the documentary evidence that we've discussed this morning. The immediate reaction of Stenkamp being, while confronted with this request to represent DEA at a military phone call, saying, no, no, no, you need to... Did you first discuss this with your chain... Did you run this through your chain of command? The answer is, no, you did not. That is consistent with... Can I ask, what are the best citations, not just that Stenkamp and others were credible, but that they were credible in testifying, or that they did testify, we would have taken this action even if he had been a little bit impolite or testy, I think was the word used before, but not on behalf of his military superiors. Okay. Well, I'll focus on the testimony of Araviaga, Stefik, and Stenkamp because they are the individuals that are... They're the individuals involved in the decision not to renew the tour request. I think that one of the things that all attested to, Stefik indicates that the email in which... The citations are more helpful than your reading. I will... Actually, if you want to walk through the whole thing with specific chain of command... Let me just be sure we're on the same page. What I'm interested in is not that they cared about the chain of command, but the specific proposition we would have denied the tour regardless. That goes primarily to a discussion of... Well, the problem is that there is an inextricable linkage between the rudeness that they all comment on, which is apparent from the face of the email. You can judge the level of rudeness a lot of different ways in that email. Especially since the rudeness is going both ways. It looks like it started from Stenkamp. Mr. Stenkamp testified, Joint Appendix 815, that even if he had followed the chain of command, even if Mr. McMillan had followed the chain of command, he would not have renewed Mr. McMillan's tour request because Mr. McMillan's investigations, quote, did not appear to be investigations that merited a GS-13. Mr. Stenkamp goes on, I didn't think he meshed with the team notion that I was trying to cultivate there in Lima. He was a lone wolf, liked to do his own thing. Then why were all his reviews at minimum outstanding or exceptional? The board found that Mr. Araviaga credibly testified, for example, that you could be a very good agent and still, I guess basically, Mr. Araviaga was asked this question. It's at Joint Appendix 500-01. One could be an exceptionally good agent, seize millions of kilos of cocaine, put 120 people in jail. He goes on to list several things. And they're disrespectful, they're not following the chain of command.  So I think those are the factors. So I don't think there's anything in the DA policy that says you have to have a certain rating that you're entitled to a tour renewal. Certainly that was known in this office, that tour renewals were not automatic. Right, so that testimony is inconsistent with Stenkamp's testimony. Stenkamp says, I really based it on the fact that he didn't meet benchmarks and his immediate supervisor concedes that there are no benchmarks. Actually, respectfully, Your Honor, Mr. Stenkamp testified that he would not have renewed the tour request because Mr. McMillan's investigations did not appear to be investigations that merited a GS-13. I realize that there's a lot of testimony that there were three individuals involved in this decision to deny the tour request working together. So certainly there was the disrespect, there was the failure to follow chain of command, and then there was a protracted discussion of performance matrix. But in terms of there not being anything in writing as far as performance matrix are concerned, one of the things that Mr. Araviaga testified to was saying, so this is an exchange that occurs on pages 499 to 500 of the joint appendix. Mr. Araviaga says, well, what specifics are you talking about? There's zero arrests, zero indictments, zero money seizures speaking to Mr. McMillan's specific performance. But in his performance review, the one right before that, they went into great detail about all the things he'd accomplished and what a good agent he was. Why do those fall off? Those rate justified an exceptional rating. This is the more contemporaneous... The reality is that this is the more contemporaneous rating and taking into account the... For the tour request, obviously rating is not all that matters. That's the testimony, but also there's the record evidence of the difficulties he started to have with management. The point here is that you have an employee that refuses to accept the decisions of management regarding the use of the agency's own material. What about the argument on the other side is that he did ultimately... He questioned it once, and they said no, and he said okay. He did not keep coming back. He didn't do it without authorization. All he did was, after being taken all the way down the road with the edits being done by StentCamp himself and changes being made to his report, he's told at the last minute he can't use his report, and he says, this doesn't make sense to me. You say you can't do it, so he doesn't do it. How is that not following orders? The issue was that he was not initially seeking to go through the proper channels to release information outside the DEA, an environment where the testimony universally established that that was important for safety and for consistency of message. As far as he didn't keep coming, he certainly made his one response count. He went on for several pages criticizing, implicitly criticizing his third-level supervisor's Bolivia policy, stating, well, I will participate in the FVTC as an Army officer where my service is appreciated. He opens the email saying, sir, for your knowledge, I am a qualified field-grade military intelligence officer, and goes on for pages. The one time where you're saying he questioned authority, it certainly was quite a lot. It certainly was a zinger of the type that one would not ordinarily expect to see addressed to superiors in that context. In addition, it's part and parcel of a larger pattern where he does internally question Mr. Stenkamp's decision with Walsh and does criticize it as illogical. This is an employee that... He doesn't call Stenkamp illogical. He says, you're requiring me to go back and do additional research. That would be illogical. Well, basically, that's a response to an email from Mr. Walsh that says, Pete, sorry, but our regional director, Stenkamp, wants all references to FSR to be removed from the report, and what follows is an immediate complaint. And he does say that's illogical, but that is a prior email of Mr. Stenkamp's decision to exclude. Okay. I think we've exhausted the issue. Thank you, Your Honor. For all the reasons we've stated today and set forth in our brief, respectfully request that the Court affirm the decision of the MSPB. Thank you, Ms. Haley. Mr. Carter. Thank you, Your Honor. To answer Judge O'Malley's question about remand, I do think that the record there is enough here for the Court to decide that the government could not carry its burden. Why? Because if the government were to now come up with something else, this would be what the Supreme Court has said in Reeves and other cases as dissembling. It's a false reason now. It's different than what was given before. How do you get around the credibility determinations? The credibility determinations, as I argued before, are infected with all of the failure to shift the burden analytically. Everything that we're talking about, the email at issue, the defending after the edits that Your Honor pointed out, all of that was, you know, his assignment is now kaput and he's got to start all over again. He's giving it one last-ditch effort and this is all while he's in Florida via email defending what was his role in doing this and why it would be a good idea. It's actually, I think, what we want our DEA agents to do. Not to, of course, insult anyone, but to stand up for themselves and to say where there's an opportunity. That's what it was. Mr. Stenkamp, you're missing a good opportunity. I'm well positioned here to help with this. Mr. Stenkamp didn't want to take him up on that. Mr. Stenkamp, as Your Honor has pointed out, didn't know, didn't even remember all of this that happened and why? Because, as Your Honor pointed out, this is a small office. Walsh took him by the hand and please, if for no other reason, remember this. The dissemination of DEA, you know, stuff. The lawyers in this case are a handicap because we're not cleared, so we don't know what the clearance was. We don't know the substance of what was at issue here. But the fact is that the military intelligence officer, Walsh, he's the one whose job it is to know whether it's being disseminated or what. When McMillan goes down the hall and says to Walsh, I'd like to know about what kind of materials I should use for this army assignment, buddy, colleague, friend, and he says, oh, well, there's this FSR. Walsh is the one who has to know that would be giving it outside DEA. Walsh is the one who has to know that rule. Walsh is the one to know if there's a chain of command rule to be involved here. Walsh is the one to observe it. And it is the height of hypocrisy, I think, for the agency to come and say that it was a burden on McMillan and he should have known this from the get-go. And that's not something, yes, he knows about chain of command when we're talking about people with guns drawn, but here we're talking about a military intelligence assignment that is within the government. So it's just not appropriate. I notice I'm out of time. I submit on the papers and thank Your Honor for the opportunity to argue. Thank you. Thank you both. The case is seconded in dissolution. That concludes our arguments for this morning. All rise. The honorable court is adjourned until tomorrow morning. It's 10 o'clock a.m.